TROJAN OIL COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 33757. Promulgated July 19, 1932.

*John B. Milliken, Esq., Claude I. Parker, Esq.,* and *George H. Koster, Esq.,* for the petitioner.
*J. L. Backstrom, Esq.,* for the respondent.

664

OPINION.

MATTHEWS: The petitioner contends that the impounded funds received in 1921 were at no time income to it nor taxable to it as such, but were income to the receiver as fiduciary and should have been returned as such by him in the years of their receipt; that if they were income to petitioner they were accrued on August 18, 1920, when it released to the Government its right, title and interest in the lands and applied for a lease under the Oil Land Leasing Act of February 25, 1920; and that the impounded funds constituted a gift by the Government to petitioner under a remedial statute, and, as such, are nontaxable. If the first point should be decided against it, the petitioner contends that the relinquishment of its claim was a loss which is allowable as a deduction in 1921 and that it is entitled

to special assessment for 1921 under sections 327 and 328 of the Revenue Act of 1921, on the ground that its net income for that year is abnormally high, owing to the realization in one year, by the receiver's payment of the impounded funds, of income earned during a period of years.

· The receiver from whom the impounded funds were received was in possession of only 60 acres of the 140 acres acquired by petitioner from the Pan-American Oil Company in 1914. The other 80 acres were a part of the lands included in the Taft Withdrawal Act of September 27, 1909. There is no evidence as to the disposition of petitioner's claim to the 80 acres.

Since the hearing in this case, the Supreme Court, in *North American Oil Consolidated* v. *Burnet*, 286 U. S. 417, has passed on the first question involved in this proceeding. In that case, as here, the Government brought suit to oust the company from possession of certain oil lands embraced in the Taft Withdrawal Act of September 27, 1909, and a receiver was appointed in 1916. Funds derived from the proceeds of oil were impounded by the receiver during that year. The District Court, in 1917, dismissed the suit of the Government and ordered the funds impounded by the receiver to be released to the claimant and they were so released in 1917. The petitioner contended there, as here, that the funds were taxable income to the receiver in the year 1916, when they were earned; that, if not returnable by the receiver, they should have been returned by the company for 1916, because they constituted income of the company accrued in that year; that, if not taxable as income of the company for 1916, they were taxable as income for 1922, since the litigation was not terminated in its favor until 1922. The court held:

*First.* The income earned in 1916 and impounded by the receiver in that year was not taxable to him, because he was the receiver of only a part of the properties operated by the company. * * *

*Second.* The net profits were not taxable to the company as income of 1916. For the company was not required in 1916 to report as income an amount which it might never receive. See *Burnet* v. *Logan*, 283 U. S. 404, 413. Compare *Lucas* v. *American Code Co.*, 280 U. S. 445, 452; *Burnet* v. *Sanford & Brooks Co.*, 282 U. S. 359, 363. There was no constructive receipt of the profits by the company in that year, because at no time during the year was there a right in the company to demand that the receiver pay over the money. Throughout 1916 it was uncertain who would be declared entitled to the profits. It was not until 1917, when the District Court entered a final decree vacating the receivership and dismissing the bill, that the company became entitled to receive the money. Nor is it material, for the purposes of this case, whether the company's return was filed on the cash receipts and disbursements basis, or on the accrual basis. In neither event was it taxable in 1916 on account of income which it had not yet received and which it might never receive.

*Third.* The net profits earned by the property in 1916 were not income of the year 1922—the year in which the litigation with the Government was finally terminated. They became income of the company in 1917, when it first became entitled to them and when it actually received them. If a taxpayer receives earnings under a claim of right and without restriction as to its disposition, he has received income which he is required to return, even though it may still be claimed that he is not entitled to retain the money, and even though he may still be adjudged liable to restore its equivalent. See *Board* v. *Commissioner of Internal Revenue*, 51 F. (2d) 73, 75, 76. Compare *United States* v. *S. S. White Dental Manufacturing Co.*, 274 U. S. 398, 403. If in 1922 the Government had prevailed, and the company had been obliged to refund the profits received in 1917, it would have been entitled to a deduction from the profits of 1922, not from those of any earlier year. Compare *Lucas* v. *American Code Co.*, *supra*.

Although in the instant case more than one year's earnings were impounded and the litigation was decided in favor of the Government, we think the decision in the *North American Consolidated* case governs in this case. Since the receiver in the instant case did not hold all the petitioner's property, the earnings impounded each year were not taxable to him.

The reasoning of the court as to the second and third points also applies with equal force here. The petitioner in the instant case claimed an interest which was very doubtful and was in litigation. A receiver was appointed by the District Court in 1915. That court made its decree final in 1919, adjudging that the Government's title was sound and that petitioner's title was invalid. Thereafter, petitioner appealed, but before judgment was given by the Circuit Court, petitioner entirely relinquished and abandoned all claim to right, title and interest in the land, and applied on August 18, 1920, for a lease under the Leasing Act of Congress of February 26, 1920. This application was finally accepted by the Government and a lease executed on January 6, 1921, effective as of August 18, 1920. A few days later, on January 17, 1921, the Circuit Court decreed the release to the petitioner of the impounded funds (less the Government's royalty reserve under the lease) and the receiver of the District Court, in obedience to its mandate, released this sum and paid it over to the petitioner. It appears clear, therefore, that not until 1921, when the application for the lease was approved by the Government, and the Circuit Court entered its decree, did the petitioner have any right or title of any sort in these impounded proceeds of oil sales. Moreover, its right perfected in 1921 was not that which it had originally asserted against the Government in the pending suit, but was a new and completely independent right arising not to itself as a rival claimant, but from its new position as lessee of the Government. Such a right as petitioner had, therefore, could not have accrued until 1921, when the lease was approved by the Government

and executed. On these facts we can entertain no doubt that the impounded funds were income to petitioner in 1921, when its right under the lease was perfected. It so happened that the impounded funds were paid over to it in the same year, 1921. It will be seen, therefore, that, whether the petitioner was on the cash or the accrual basis, our decision in the circumstances would be unaffected by that fact.

We are not unaware of the decision of the District Court (S. D. Calif.) in *Obispo Oil Co.* v. *Welch*, 48 Fed. (2d) 872, in which, under circumstances very closely analogous to those here present, that court decided that such proceeds might be returned as income by the taxpayer for the several years in which the sales were made prior to 1920. Certain facts are present in that case which may afford a ground for distinction, but if it be supposed that the court in that case intended to lay down a general rule upon the retrospective effect of the Act of February 26, 1920, we think it has been overruled by the Supreme Court's decision in *North American Oil Consolidated, supra*, applying as it did, the principle of *Burnet* v. *Sanford & Brooks Co.*, 282 U. S. 359.

The petitioner further contends that the Act of Congress of February 26, 1920, was a remedial statute and that the impounded funds paid over to the petitioner on the granting of the lease were, therefore, not income to the petitioner, within the definition of *Eisner* v. *Macomber*, 252 U. S. 189, 207, but constituted a nontaxable gift by the Government to the petitioner. Petitioner cites in support of this reasoning the decision of the Secretary of the Interior in the case of *Honolulu Consolidated Oil Co.*, 48 Lane's Decisions, 303, in which section 18 of the statute in question is referred to as a " remedial section "; and *Barnes* v. *Poirier*, 64 Fed. 14; *United States* v. *Hurst*, 2 Fed. (2d) 73; *Edwards* v. *Cuba R. R. Co.*, 268 U. S. 28, on the supposed analogy of Government grants of homesteads and mining patents on lands or of Government railroad subsidies. We do not find any analogy in these cases. Even if we should go so far as to concede that the lease was a gift from the Government to the petitioner, the value of that lease is not here in issue, but the income earned under it (in prior years but reached by its retroactive effect). To allow the exemption of income so earned prior to 1920 would logically require the exemption of all subsequent income—a *reductio ad absurdum* of the whole proposition.

There remain the two alternative contentions of the petitioner which may be very shortly disposed of. It is argued that the petitioner suffered a loss, admittedly in the year 1920, when the petitioner relinquished and quitclaimed all its right, title and interest in the 60-acre tract to the United States Government; that the amount

of this loss was that charged off on its books as the cost of the whole property, $572,805.03 ($23,858.85 representing " additions and betterments ") ; and that the loss, although sustained in 1920, should be allowed in 1921 by way of reduction of the payments made to the petitioner in that year by the receiver, who then released the impounded funds. There are several fatal objections to this argument.

On the evidence, it is impossible to say precisely what the interest acquired in 1914 cost the petitioner. Neither do we know what became of petitioner's claim to the 80 acres. There is a very grave question whether the petitioner had any legal interest whatsoever in the oil lands themselves in 1914, or at any time, until it acquired such an interest *as a lessee* in 1921. The United States District Court very plainly held in its decree of December 24, 1919, that the petitioner had no interest in the 60-acre tract, and although this cause was appealed by the petitioner, and was, of course, subject to reversal in the upper courts, petitioner's subsequent action in applying for a lease from the Government and quitclaiming its rather shadowy interest, indicates rather plainly the petitioner's own view of the value of that interest.

In the second place, whatever the petitioner paid for its interest in the 60-acre tract must now be regarded as the cost to it of the Government's lease, which otherwise would have to be regarded as without cost. The petitioner's interest as lessee was substantial and clear at law, whereas its prior claim was, as we have said, very questionable.

In these circumstances, we can not find that petitioner suffered the loss claimed in 1920. The argument that such a loss, if found, should be allowed against the respondent's payment of impounded funds in 1921, is answered by the Supreme Court's decision in *Burnet* v. *Sanford & Brooks, supra.*

This brings us to the petitioner's final contention, that, by reason of the abnormality in its 1921 income resulting from the payment to it in that year of moneys earned in fact in the six previous years, it is entitled to special assessment under sections 327 and 328 of the Revenue Act of 1921.

In Law Opinion 1109, C. B. I–2, p. 253, at 256, the Commissioner said :

It is my opinion that the following represent the typical and common cases in which there is present an abnormal condition affecting capital or income of a corporation: * * * (4) where the net income for the year is abnormally high, due to the realization in one year of (a) income earned during a period of years, or (b) extraordinary profit derived from the sale of property the principal value of which has been demonstrated by prospecting or exploration and discovery work done by the taxpayer, or (c) gain derived in one year from

the sale of property the increase in value of which had accrued over a period of years; and (5) where proper recognition or allowance can not be made for amortization, obsolescence, or exceptional depletion due to the World War.

In this opinion the Commissioner was interpreting sections 327 and 328 of the Revenue Act of 1918, which were reenacted by Congress without change in the Revenue Act of 1921.

The respondent resists this contention by suggesting that under the rates of the Revenue Acts of 1917 and 1918, if the moneys later received should be considered as accrued in the years 1917, 1918, 1919 and 1920, the tax would greatly exceed the excess-profits tax paid by the petitioner in 1921; and that consequently no abnormality in income existed in 1921. We can not follow the logic of this argument.

We are of the opinion that an abnormality of income existed here which would entitle petitioner to the benefit of the relief provisions. The facts speak for themselves. The logical inconsistency in regarding as "income earned during a period of years" the sums paid petitioner under the lease in 1921, although before 1921 the petitioner had no valid legal claims to the proceeds of these oil sales, is offset by the practical consideration that under the leasing act petitioner acquired a new legal right which applied retroactively; so that the petitioner must be regarded, for this purpose only, as having earned in the several prior years the sum to which it became entitled and received in 1921.

The situation in the present case is somewhat similar to that in *Red Salmon Canning Co.*, 15 B. T. A. 790, where we held the taxpayer's income abnormal in 1919, by reason of the fact that it returned in that year income earned in 1919 from the sale of its salmon pack of that year and also income resulting from the sale in the same year of 80 per cent of its 1918 pack which had been commandeered for food purposes by the United States Government in the prior year and released only after termination of the late war. We said:

Certainly this situation, resulting as it did in practically throwing two years' income into the year 1919, was not one occurring in the ordinary course of business.

Cf. *Pittsburgh Supply Co.*, 14 B. T. A. 620; *Grand Rapids Show Case Co.*, 12 B. T. A. 1024.

It may be noted that the case of *C. Bruno & Sons, Inc.*, 14 B. T. A. 103, in which the Board reached an opposite decision on facts somewhat similar to those in the *Red Salmon Canning Co.* case, the sale in a subsequent year of goods impounded by a foreign country through the war period, is clearly distinguishable on the ground of insufficient evidence in the latter case to show any resulting abnormality.

We hold, therefore, that the amount of the funds released by the receiver to the petitioner in 1921 is income to it in that year, but that the petitioner should be allowed the relief afforded by the Revenue Act of 1921 in the matter of special assessment for that year.

Reviewed by the Board.

*Further proceedings may be had under Rule 62 (c).*