**LITTLE WAR CREEK COAL CO. v. UNITED STATES.**

No. 3455.

District Court, S. D. West Virginia, Charleston.

Sept. 22, 1938.

Frederick L. Thomas, of Charleston, W. Va. (Price, Smith & Spilman, of Charleston, W. Va.), for petitioner.

Charles M. Love, Asst. U. S. Atty., of Charleston, W. Va. (George I. Neal, U. S. Atty., of Huntington, W. Va., James W. Morris, Asst. Atty. Gen., and Andrew D. Sharpe and Paul R. Russell, Sp. Assts. to the Atty. Gen., on the brief), for the United States.

McCLINTIC, District Judge.

This action was instituted for the purpose of recovering from the respondent part of an additional assessment of corporate income taxes alleged to have been illegally collected from the petitioner, Little War Creek Coal Company, by the respondent, United States of America, for the calendar year 1929. Petitioner's claim for recovery is based upon alleged erroneous actions of the Commissioner of Internal Revenue in (1) failure to allow as a deduction from the gross income of petitioner for the year 1929 certain items of ordinary and necessary expense, aggregating $4,609.13; (2) failure to allow as a deduction from gross income of petitioner for the year 1929 the sum of $20,000 paid by petitioner to Eastern Coal & Export Corporation in settlement of controversies arising out of a contract dated January 21, 1922, between the two companies, and adding to petitioner's income for said year the sum of $2,599.57 as profit realized by petitioner from the settlement of said controversies; and (3) including in petitioner's income for the year 1929 the sum of $2,766.62 as profit realized by petitioner from the purchase of $37,620 face value of its outstanding bonds at the price of $34,853.38.

Counsel for the parties filed a written stipulation covering certain admitted facts and particularly formal matters, so that no question as to proper procedure, limitations or other formalities is involved.

The court finds the facts necessary to a decision of the issues involved as follows:

Petitioner is a corporation organized and existing under the laws of the State of West Virginia, having its principal office at Litwar, McDowell County, West Virginia. It was organized in 1921, and since that time has been continuously engaged in the production and marketing of coal from its property and plant located in McDowell County, West Virginia.

On or about the 15th day of March, 1930, petitioner filed with the Collector of Internal Revenue for the District of West Virginia, its corporate income tax return for the year ending December 31, 1929, which return showed a net income for said year of $36,866.77, and a tax thereon of $4,165.34, which tax was paid in full to respondent's then Collector of Internal Revenue, Edwin A. Brast. Subsequently, an examination was made of the books and records of petitioner by an agent of respondent, and pursuant thereto an additional tax of $4,998.21, with interest thereon amounting to $751.37, was assessed, and paid by petitioner on September 28, 1932, to respondent's then Collector of Internal Revenue, Vernon E. Johnson, of Parkersburg, West Virginia, who was not at the time of the institution of this action, nor has he since been, in office as Collector of Internal Revenue. A proper written and duly executed claim for refund, embracing the additional assessment of taxes and interest above set forth, was filed by petitioner within the time required by law, said claim for refund rejected by the Commissioner of Internal Revenue, and this action instituted in due season.

From the year 1922 to the year 1927, inclusive, petitioner produced 3,473,105.45 net tons of coal, or an average of approximately 217,000 tons per year. Over the period from 1922 to 1929, its annual production progressively increased from 81,138 tons in 1922 to 307,360.25 tons in 1929. Thereafter from 1930 to 1937, inclusive, there was a decline in the annual production from the 307,360.25 tons produced in 1929, to an estimated 215,000 tons in 1937. At no time after 1929 has the company produced as much coal as it did in that year, the next highest production being 304,764.10 tons produced in 1933. The evidence all indicates that petitioner's mine reached its peak or maximum capacity of production and development in the latter part of 1928 or the early part of 1929. Witnesses familiar with petitioner's mine, the extent and nature of its workings, the quality of its coal, and other mine conditions from the time it began operations in 1921 to the present, testified in effect that the mine was fully developed by the year 1929, and has been on a gradual decline since that time. It is apparent from the evidence that since 1929 it has been progressively more difficult to maintain petitioner's production, market its coal and

maintain the unit cost thereof. It is also a matter of common knowledge that a mine which over a period of some sixteen years has never exceeded an annual production of only slightly more than 300,000 tons per year, must have in the very nature of things become fully developed after seven or eight years of constant operation. Mine maps and other data submitted fully substantiate this proposition. It appears that due to the extent and nature of petitioner's mine workings, the quality of its coal, the lengthening hauls, recession of working faces and widening out of working areas, the purchase of items of equipment aggregating $3,609.13, with the exception of the item of Narcoti heaters and pipe fittings used in petitioner's store building, and purchased at a cost of $247.88, was necessary to maintain the operation of petitioner's mine at the normal level of production, and such purchases did not increase such production or tend to do so, nor did they increase the value of petitioner's mine and plant as a going concern.

Petitioner entered into a contract with the Eastern Coal & Export Corporation of Richmond, Virginia, under date of January 21, 1922, by which the latter company agreed to lend petitioner the sum of $100,000, evidenced by three notes in equal amounts, executed by Little War Creek Coal Company, payable to J. C. and Sarah Amelia Sullivan, and by them endorsed and delivered to the Eastern Coal & Export Corporation. This contract provided in substance that in consideration of this loan, the Eastern Coal & Export Corporation should be the sole and exclusive selling agent of petitioner for the purpose of marketing its coal. The agent was to receive a commission of 8% of the selling price of the coal, which was not to be less than 15¢ per net ton, for its services, and in addition thereto, it was authorized to deduct from the proceeds received from the sale of coal 10¢ per net ton to be applied in payment of the loan. The contract was to remain in effect until 1,000,000 tons of coal were shipped and sold. An accounting by the agent was to be made monthly, and on the 20th day of each month the agent was to remit to petitioner proceeds received from the sale of coal during the preceding month, less the deductions above mentioned.

In 1925, certain creditors of petitioner filed an involuntary petition in bankruptcy against it in this Court, and on November 16, 1925, J. H. Bannister, now president of the company, and George W. Craft, now secretary, treasurer and general manager of the company, were appointed receivers in bankruptcy, with power to operate the company's mine. They conducted its business as such receivers until April 4, 1927, when they were discharged, and the bankruptcy petition dismissed. During the period of the receivership, arrangements were made with the creditors of petitioner, whereby they agreed to accept first mortgage ten year bonds in lieu of the debts owed by the company to them, with the exception of the landlord of petitioner, who demanded and received, in cash, payment of certain past due royalties. Immediately before the institution of the bankruptcy proceedings, Eastern Coal & Export Corporation failed to remit to petitioner approximately $40,000 of the proceeds received from the sale of petitioner's coal, which the Eastern Coal & Export Corporation was required to do under the terms of the contract of January 21, 1922. Thereafter no coal was shipped under this contract, and marketed through the agency of the Eastern Coal & Export Corporation. All relations between the two companies were severed in 1925, when the receivers assumed the conduct of petitioner's business. At that time, and up until the year 1927, the balance of the loan with unpaid interest appearing on the books of petitioner as owing to Eastern Coal & Export Corporation was $22,599.57. After the dismissal of the bankruptcy petition, and the discharge of the receivers, the company officials began to inquire into the status of this alleged balance of $22,599.57. They made an extensive investigation thereof, in the course of which they conferred with former employees and officers of the petitioner, former employees of Eastern Coal & Export Corporation, all of whom were familiar with the performance of the parties thereunder, and with petitioner's attorneys and auditors, who were likewise conversant with all the facts relating to the contract and the account. After such investigation, the officers of petitioner, its attorneys and auditors, reached the conclusion that petitioner did not owe the alleged balance of $22,599.57 to the Eastern Coal & Export Corporation, and in conformity with such decision this amount was returned upon petitioner's income tax report for the year 1927, as profit. In the meantime, Eastern Coal & Export Corporation insti-

tuted an action for the purpose of recovering the alleged balance due, and owing to it, and subsequently asserted other claims, including demurrage, reconsignment charges and damages for the alleged breach of the contract. In 1929, petitioner settled all of these claims by paying to the Eastern Coal & Export Corporation the sum of $20,000. Petitioner, having returned the $22,599.57 as a profit in 1927, accordingly deducted the $20,000 paid in settlement of the controversy from gross income for the year 1929. Respondent refused to allow this deduction of $20,000, and added to petitioner's income for 1929 the sum of $2,599.57 as profit realized by petitioner on account of the making of the settlement.

Considerable testimony was introduced to show that petitioner never received $21,920.74 of the original $100,000 loan made to it by Eastern Coal & Export Corporation. Also, there was other testimony as to the correct amount of the loan remaining due at the time of the settlement, the interest accrued thereon, the amounts claimed by Eastern Coal & Export Corporation as demurrage and reconsignment charges, and damages for breach of contract, as well as the proper allocation of the $20,000 paid in settlement to these various items. It is unnecessary to make any findings of fact with respect to these various issues, because of the views entertained with respect to the facts next following.

Petitioner, after a thorough investigation, in good faith, and for sound, good and sufficient reasons, returned the alleged balance of the Eastern Coal & Export Corporation account standing upon its books, amounting to $22,599.57, as a profit in the year 1927. Consequently, when in 1929 it paid the sum of $20,000 in settlement of its controversies arising out of the contract of January 21, 1922, such payment was properly deductible from income for the year in which paid.

The bonds issued by petitioner to its creditors in lieu of the accounts and claims held by them were upon the basis of $1 face value of bonds for each $1 of debts or claims held by the creditors. Petitioner purchased $37,620 face value of these bonds in 1929 at the price of $34,853.38; that is, the price paid for the bonds so purchased was $2,766.62 less than the face value of the bonds acquired. Respondent contends that this $2,766.62 is taxable profit realized by petitioner, while petitioner contends that the accounts and claims for which the bonds were issued had at the time of issuance a market value of approximately 40% of their face, and that the bonds having been issued for less than their face value, no profit was realized when the bonds were purchased for more than the consideration for which they were issued. The evidence amply sustains the contention that the accounts and claims for which the bonds were issued, were worth not more than 40% of their face value, but the fact remains that these claims and accounts were obligations of petitioner standing upon its books in the full face amount thereof.

From the facts stated above, the following conclusions are drawn:

(1) Petitioner's mine having reached its peak or maximum capacity of production and development in 1929, and it appearing that additional equipment was necessary to maintain the operation of the mine at the level of normal production on account of lengthening hauls, recession of working faces, widening out of working areas, and increased volume and seepage of mine water, the remaining consideration is whether the particular items of equipment making up the $4,609.13 claimed by petitioner as ordinary and necessary expense are such as tended to increase the production of the mine, or the value thereof, as a going operation, or whether they merely tended to maintain the level of production due to the increased difficulty of mining under the conditions above set forth.

It is said in Marsh Fork Coal Company v. Lucas, 4 Cir., 42 F.2d 83, Point 1 of the syllabus: "Expenditures of coal company for electric locomotives, mine cars and rails, made necessary to maintain output, by removal of coal and recession of working faces held deductible as expense."

Judge Parker said in the opinion of the Court:

"When an operator has removed sufficient coal to extend his tunnels so that he cannot maintain production with the equipment which he has, he must as a matter of course, lay down more track and put in more cars and locomotives. The question is, Shall the expense thereby incurred be charged against the coal, the removal of which necessitated the expenditure to maintain normal operation, or against the coal yet unmined? We think it is but fair to charge against the coal which has been

mined the expense which its removal has necessitated. We think, also, that this is the only practicable method of accounting. To capitalize the expenditures made to maintain normal output means that the cost of removal is pyramided against the coal further back in the mine, with the result that the coal next the head house will appear to have been mined at abnormal profit and that farther back at a loss.

"The fact that the trackage laid and the cars and locomotives installed may last for a number of years is, we think, immaterial. However long they may last in the mine, they are but maintaining the mine's capacity, which would otherwise have been impaired by the lengthening of the tunnels due to the removal of the coal. While not repairs, they are in the nature of repairs, in that they are necessary to maintain the operation of the mine at the level of normal production."

In the case of United States v. Roden Coal Company, 5 Cir., 39 F.2d 425, the Court approved the charging to expense of such items as wheels for mine cars, water pipes, steel rails, etc., saying [page 426]: "In view of the conclusions of the District Court that the mine had been completely developed before the purchase of the various items, that they were necessary to maintain the regular and normal output, that none of them increased the output or decreased the cost of production, or increased the capital value of the property, they could hardly be considered improvements."

■ The items aggregating $4,609.13, which petitioner seeks to expense, and which respondent insists should be capitalized, consist of Narcoti heaters and pipe fittings purchased for use in petitioner's store building at a price of $247.88, twenty-five complete sets of car wheels, irons and bolts purchased at a cost of $3,712.25, a mine pump costing $524.29, and a filing cabinet costing $124.71. The record does not disclose the exact nature of the item of Narcoti heaters and pipe fittings, nor the purpose of their purchase, except for use in petitioner's store building. In the absence of some further showing, this item cannot properly be allowed as an expense under the authorities hereinbefore cited. The car wheels, irons and bolts were purchased to build and repair mine cars, made necessary by increased difficulty in bringing petitioner's product to the outside of the mine, due to lengthening hauls, and

increasing, widespread areas of development. The mine pump was made necessary because of increased volume and seepage of water into the mine, due to removal of the seam of coal, and the filing cabinet was necessary to take care of the records and papers, which, in the natural course of things, accumulate over a period of years, and was not purchased to take care of additional business incident to increased production.

It seems clear, therefore, that all of the items mentioned were properly chargeable to expense under the authorities hereinbefore cited, except the Narcoti heaters and pipe fittings costing $247.88, and that the action of respondent in disallowing these items as expenses and charging them to petitioner's capital account, is unwarranted.

(2) The next question for consideration relates to the action of respondent in disallowing the deduction of $20,000 paid by petitioner in 1929, in settlement of its controversies with Eastern Coal & Export Corporation, and adding to petitioner's taxable income for said year the sum of $2,599.57 on account thereof.

■ It is well settled that a taxpayer for good, sound and sufficient reasons may, and should deduct accounts receivable, which are deemed uncollectible at the time when they are so determined to be worthless. It is equally well settled that if in some subsequent year a taxpayer is able to collect such debts so charged off as uncollectible, he should return so much as is collected, as a profit.

Article 151 of Regulation 69 promulgated under the Revenue Act of 1926, effective for 1927, is in part as follows: "Where all the surrounding and attending circumstances indicate that a debt is worthless, either wholly or in part, the amount which is worthless and charged off or written down to a nominal amount on the books of the taxpayer shall be allowed as a deduction in computing net income. * * * * Before a taxpayer may charge off and deduct a debt, in part, he must ascertain and be able to demonstrate with a reasonable degree of certainty the amount thereof which is uncollectible. Any amount subsequently received on account of a bad debt, or on account of a part of such debt previously charged off and allowed as a deduction for income tax purposes must be included in gross income for the taxable year in which received.

In determining whether a debt is worthless in whole or in part, the Commissioner will consider all pertinent evidence, including the value of the collateral, if any, securing the debt, and the financial condition of the debtor. Partial deductions will be allowed with respect to specific debts only."

■ If for equally good and sufficient reasons, a taxpayer determines that he will never be called upon to pay some outstanding obligation which he owes, he should treat it as a cancelled or forgiven debt, and return it as income (Article 49, Regulation 69). It follows that should he later be compelled to pay such previously cancelled debt or obligation, he is entitled to deduct the amount so paid. Board v. Commissioner of Internal Revenue, 6 Cir., 1931, 51 F.2d 73; North American Oil Consolidated v. Burnet, Commissioner, 286 U.S. 417, 52 S.Ct. 613, 76 L.Ed. 1197.

The case last above cited was made the basis of an opinion by the General Counsel for the Department of the Treasury of the United States, in which a number of cases relating to the point in question are discussed, and a contrary opinion by the Department disapproved. (G.C.M. 16,-730, C.B. XV–1–179):

"An opinion is requested whether certain profits included in the taxpayer's income tax returns for the years 1928 and 1929 should be eliminated therefrom because in a later year he was required to account for such profits to another. * * *

"The taxpayer reported as income for the years 1928 and 1929 his profits from the sale of the stock, but now contends that such profits should be eliminated from income for those years because of the adverse judgment rendered in a later year.

"It is well settled that when a taxpayer receives earnings under a claim of right and uses them as his own, he has received income which he is required to return, for Federal income tax purposes, in the year of receipt even though another may be asserting a right to those earnings and may subsequently, by litigation or otherwise, compel him to pay them over. (North American Oil Consolidated v. Burnet, 286 U.S. 417, [52 S.Ct. 613, 76 L.Ed. 1197] Ct.D. 499, C.B. XI–1–293; Board v. Commissioner, [6 Cir.] 51 F.2d 73, certiorari denied, 284 U.S. 658, [52 S.Ct. 35, 76 L. Ed. 557] Trojan Oil Co. v. Commissioner, 26 B.T.A. 659.) * * *

"In the instant case the taxpayer received the income under a claim of right and without restriction as to its disposition. On authority of the cases cited herein, this office is of the opinion that the profits in question should not be eliminated from the taxpayer's gross income for the years 1928 and 1929, but that the taxpayer is entitled to a deduction, for the year in which paid, of the amount of the profits paid to the trustee for the M Company.

"G. C. M. 1582 (C.B. VI–1, 171) is modified in so far as it is inconsistent with the views herein expressed. It is recommended that C.D. 825 (C.B. 4, 95) and I. T. 1164 (C.B. I–1, 17) be revoked and that C.D. 1141 (C.B. 5, 134) be modified in so far as it is inconsistent with the views herein expressed."

■ The general holding of these various authorities is to the effect that if a taxpayer receives or retains sums under a claim of right and without restriction as to its disposition, he has received income which he is required to return, and if subsequently he be adjudged liable to restore its equivalent, he is entitled to a deduction from profits in the year in which such restoration is made. The fact that there may be a suit pending at the time does not change the course of action to be pursued. North American Oil Consolidated v. Burnet, Commissioner, supra; McDuffie v. United States, Ct. Cl., 19 F.Supp. 239.

■ Since petitioner in 1927 in good faith and for ample, sound and sufficient reasons, returned the $22,599.57, the balance of the account appearing upon its books as a profit, and reported the same upon its tax return for that year, it follows that when petitioner paid the $20,000 in settlement of said controversies, it was entitled to deduct the sum so paid from taxable income for the year when such payment was made. For the same reason, petitioner realized no profit in the making of the settlement.

■ (3) The remaining issue involved in this case is the taxability of $2,766.62, discount upon bonds purchased by petitioner at less than their face value. The correct rule of law governing this situation is stated in the case of United States v. Kirby Lumber Co., 284 U.S. 1, 52 S.Ct. 4, 76 L. Ed. 131, as follows: "Gain to a corporation by purchasing and redeeming its bonds at a price less than that for which it had sold them is taxable income."

Some difficulty is encountered when applying this rule to the facts involved. Undoubtedly petitioner issued its bonds so purchased for debts and obligations which at the time were not worth more than 40% of their face value. If these were all the facts involved, undoubtedly no profit would have been realized from the repurchase of the bonds at a price in excess of the consideration for which they were issued. The fact, however, that the accounts for which the bonds were issued stood upon the books of the company as valid obligations in the full amount of their face cannot be overlooked. Here petitioner undoubtedly owed the full amount of these accounts, and the bonds were merely substituted for the obligations which it owed. If it had purchased the accounts at less than their face, petitioner would undoubtedly have realized a profit. The fact that it purchased the bonds rather than the accounts would not seem sufficient to absolve petitioner from reporting the gain realized as taxable income.

I am of opinion that:

(1) Petitioner is entitled to deduct from its taxable income for the year 1929, all of the items of equipment aggregating $4,609.13, except the item of Narcoti heaters and pipe fittings amounting to $247.88, less, however, the depreciation allowed and deducted from these various items in 1929, as follows:

On mine car wheels and tracks, $247.48
On pump motor and fittings, 19.66
On filing cabinet, 16.23

The total cost of items allowed, undepreciated, is $4,361.25, and the total of depreciation to be deducted is $283.37, or a net deduction of $4,077.88.

(2) There should be deducted from petitioner's income for the year 1929, the sum of $20,000 paid in settlement of the Eastern Coal & Export Corporation controversy, and the action of respondent in disallowing said deduction and adding to petitioner's income the sum of $2,599.57, is disapproved.

(3) The amount of $2,766.62, being the difference between the face value of the bonds purchased by petitioner in 1929, and the amount it paid therefor, is taxable gain to petitioner's income for said year.

It having been stipulated by the parties that after all of the evidence has been introduced in this case, the court may make its finding upon the issues involved without attempting the calculation of the amount of the judgment, if any, to be entered, and that petitioner and respondent will submit to the court calculations of the amount of the judgment, if any, to be entered, based upon such findings, it is ordered that the petitioner and respondent do forthwith submit calculations of the amount of the judgment, in conformity with this opinion.