FIRST SEATTLE DEXTER HORTON NATIONAL BANK AND HELEN KING BOOLE, EXECUTORS OF THE ESTATE OF GEORGE BOOLE, DECEASED, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 47814.   Promulgated April 26, 1933.

*James H. Kane, Esq.,* for the petitioners.
*F. B. Schlosser, Esq.,* for the respondent.

1244

1246

OPINION.

SEAWELL: The petitioners contend, in the first place, that the contract of February 15, 1926, is a divisible one and that the exchange of preferred stock of the Seattle corporation for preferred stock of the Chicago corporation is a distinct and separable transaction from the sale of 500 shares of the Chicago corporation for $50,000; and that under subsection (b) (2) of section 203 of the Revenue Act of 1926, no gain should be recognized in the exchange of stock for stock, for the exchange was made in pursuance of a plan of reorganization and as contemplated in that section. This contention, however, overlooks the fact that this section of the law provides that no gain shall be recognized " if stock or securities * * * are * * * exchanged *solely* for stock or securities," and that in this case in addition to stock the Chicago corporation also paid to petitioners cash of $70 at the least, which is sufficient to take the transaction out of the statute relied on. In any event, therefore, it appears that the transaction is governed by section 203 (d) (1) of said act. But we are not persuaded that the contract is divisible. Not only was the purchase of the 500 shares to be made " simultaneous with the sale and exchange " of the stock, but " As one of the conditions precedent to the sale and exchange of stock." (Paragraph 5 of the contract.) According to the evidence of petitioners' witnesses, the chief moving cause and consideration for the whole transaction on the part of the petitioners was the cash to be received, of which the petitioners stood in need for the purpose of settling the estate.

The provisions of the contract are so interlocked and so interdependent that a separation or division, such as is suggested, would annul some of its provisions and defeat its main purpose. If then the contract is not separable, it follows that what the petitioners did was to exchange 2,913 shares of preferred stock of the Seattle corporation for 2,121 shares of the preferred stock of the Chicago corporation and $50,070 in cash. (*Arctic Ice Machine Co.*, 23 B. T. A. 1223.) In this situation petitioners' counsel concedes that the Board should be governed by subsection (d) (1) of section 203 of the Revenue Act of 1926. This statute, under the described circumstances, provides: "the gain, if any, to the recipient shall be recognized, but in an amount not in excess of the sum of money and the fair market value of such other property." There was no "other property" in the sense of the statute here involved, and, accordingly, the limitation refers simply to the "money" received. In order to ascertain whether there was gain (to be limited by the money received) or loss, and the amount thereof, it is necessary to know the value of the properties entering into the transaction. Petitioners say that while the value of the Seattle corporation's preferred stock, for the purpose of this proceeding, was $70 per share, and the amount of cash is not in dispute, the preferred stock of the Chicago corporation was without any "fair market value" and for this reason no gain or loss can be recognized. Respondent, on the other hand, contends that the fair market value of the Chicago corporation's preferred stock was not less than $100 per share. Thus is the principal issue in the case made up.

Fair market value, as defined by the courts, is that price at which a seller willing to sell at a fair price and a buyer willing to buy at a fair price, both having reasonable knowledge of the facts, will trade. In a sense, every commodity of commerce has this fair market value if the elements combine and can be ascertained. Fair market value is not synonymous with intrinsic value nor with market price. It is not necessarily nonexistent because reasonable knowledge of the facts is known to only a few people, or because willing buyers or willing sellers are few. It is determined when the facts become known to the described buyer and to the described seller. There may be such buyers and such sellers who, because of lack of such knowledge, never meet or trade; and also there may be buyers and sellers with knowledge of their own requirements who would trade if they met and knew the existing situation.

As said in *Andrew B. C. Dohrmann*, 19 B. T. A. 507, 513:

We think it well settled that whether property at a given date has a fair market value or not is a question of fact to be determined from all of the evidence introduced and admitted in each individual case; that no set rule or formula can be employed. * * *

On a somewhat similar issue which the Commissioner was to decide, the Supreme Court in *Ray Consolidated Copper Co.* v. *United States*, 268 U. S. 373, said:

* * * As the method to be pursued in ascertaining the value is not prescribed, we think that it was left to the sound judgment and discretion of the Commissioner, *subject only to the obligation to take into consideration every relevant fact.* [Italics supplied.]

The relevant facts in this case appear from the opinion evidence of petitioners' witnesses and the attendant circumstances connected with, and included in, the contract or agreement between the petitioners and the Chicago corporation. The burden of the proof is upon petitioners (*Williams* v. *Commissioner*, 45 Fed. (2d) 61), which they maintain they have successfully carried by the testimony of several witnesses offered at the hearing. Only one expert witness, present at the hearing, testified explicitly that the stock, in his opinion, had no fair market value in 1926; but, it was stipulated that another witness, if present, would testify to the same effect, and this was received and considered as if the witness had been present and so testified. This testimony included the statement that only the officers and directors of the corporation owned the stock of the company and that the stock could be sold or bought only through them; and that the corporation at that time showed earnings.

Only one instance of trading in stock of the Chicago corporation, other than those mentioned in the agreement of February 15, 1926, was given in evidence and that was the exchange of preferred stock for common stock; but incidentally counsel for petitioners, who was also a witness, stated on the hearing (not as a witness) that about $680,000 of the million dollars of preferred stock of the Chicago corporation was issued after the reorganization. As the agreement provided that this stock could not be sold for less than par, it should be presumed that it was sold for as much as par. It was also in evidence from these witnesses for the petitioners that the balance sheets of the Chicago corporation showed in 1926 no intangible assets, and that the corporation was then making a " fair profit " and was paying regularly the dividends on the preferred stock. All the circumstances detailed in evidence indicated that the intrinsic value was not inconsistent with the claimed fair market value. Treating all the witnesses offered as experts by petitioners to be such, and considering fully and carefully all that was testified to by them, it seems the evidence amounts to but little, if any, more than that the Chicago corporation's preferred stock was closely held and not listed on any exchange or otherwise offered for sale, and that financial or other reports of the corporation's affairs were not made public so that prospective buyers could have sufficient and readily available knowledge

of prevailing conditions to appraise intelligently the values or bid for the stock if it had been offered for sale. There was, too, some apparent confusion with some of the witnesses as to whether it was the stock of the Chicago corporation before or after its reorganization about which they were called on to testify.

Expert testimony, useful and helpful as it often is, does not, of course, compel a decision contrary to other evidence which engages our best judgment. *Tracy* v. *Commissioner*, 53 Fed. (2d) 575.

The Commissioner's determination that this stock had a fair market value of $100 per share is prima facie correct and the burden is on the petitioners to overcome the correctness of this determination. *Williams* v. *Commissioner*, *supra*. This does not mean, of course, that in sustaining the presumption favoring the Commissioner we can ignore facts and circumstances present in the case which disclose a situation making untenable that presumption. " There must be a limit beyond which the presumptive correctness of the Commissioner's determination may not be stretched in order to defeat a taxpayer." *Mount* v. *Commissioner*, 48 Fed. (2d) 550. The facts and circumstances here appear not to weaken, but to strengthen materially, the Commissioner's position. In the contract of February 15, 1926, set out in the findings of fact, the Chicago corporation, which knew better than any other the value that might properly be placed on the stock, agreed to purchase 500 shares thereof as soon as it was issued at $100 per share, or to procure a purchaser at that price, and to purchase as much as five-sixteenths of the rest of the stock transferred to petitioners at the same price, after paying all accumulated dividends. In addition, the Chicago corporation agreed to safeguard the stock by limiting the amount of it to one million dollars and to sell none of it for less than par. There was no evidence offered as to the amount of this million-dollar stock issued. The witnesses offered, except the attorney for petitioners, appeared to have no knowledge, or only very limited knowledge, on the subject. The attorney, when he testified, made no mention as to this point, but in the course of the trial he volunteered the statement that about $680,000 of it had been issued. We are not required to ignore a statement made under these circumstances, as the law presumes good faith in the conduct of attorneys appearing in court, and we have no reason to alter this presumption in this case. Admissions made by an attorney at the hearing are binding on the client. *Wilson* v. *Spring*, 64 Ill. 14; *Oliver* v. *Bennett*, 65 N. Y. 559; and *Heywood v. Doernbecher*, 48 Ore. 359. The attorney appeared to be in sincerity and in the utmost good faith in what he said, and his statement was in aid of, and to clarify, the evidence of one of the petitioners' witnesses.

In petitioners' brief it is said that, "We are concerned not with 500 shares of stock, but 2,121 shares of stock, and the market value, if any, of the 2,121 shares of stock would probably be substantially different from the market value of 500 shares of stock." We have more than the 500 shares to deal with here, even if we should ignore the remark of counsel in the trial. The five-sixteenths of the remaining 2,121 shares which might be allotted to the widow amounted to 662+ shares and these the Chicago corporation agreed to purchase at par. Thus we have 1,162 shares contracted for before the stock was issued, and if the corporation issued, as counsel stated, about 6,800— shares, and at as much as par, as contracted, we have for consideration more than three-fourths of the whole authorized issue of $1,000,000, sold at a price as great as par. Sales and offers to buy made in good faith have ever been recognized as evidence of fair market value, and no authority is needed to support the proposition. Without reference to the remark of counsel during the trial, we are of the opinion, and so hold, that, considering all the evidence, including the contract and attendant circumstances, petitioners have failed to overcome the presumption favoring the determination of the Commissioner; and that the preferred stock of the Chicago corporation, including the 2,121 shares in controversy, had a fair market value at the time of the exchange of at least $100 per share. It follows that the Commissioner should be sustained.

*Judgment will be entered for the respondent.*