ANGELO ZAPPO AND DOROTHY ZAPPO, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 6436–78.     Filed August 3, 1983.

---

[7] See *Sherwood Bros. v. District of Columbia*, 113 F.2d 162, 163 (D.C. Cir. 1940).

78

*Donald J. Holzman*, for the petitioners.
*Louis J. Zeller, Jr.*, for the respondent.

SHIELDS, *Judge*: Respondent determined a deficiency of
$18,040.20 and an addition to tax under section 6653(b)[1] of
$9,020.10 in petitioners' Federal income taxes for 1974. Due to
concessions by the parties, the sole remaining issue is whether
petitioners had taxable gain in 1974 resulting from a settle-
ment agreement made between petitioner Angelo Zappo
(Zappo) and certain of his creditors.

FINDINGS OF FACT

This case was submitted fully stipulated pursuant to Rule
122.[2] The stipulation of facts and exhibits attached thereto are
incorporated herein by this reference.

---

[1] All section references are to the Internal Revenue Code of 1954 as in effect during the
year in issue.

[2] Unless otherwise indicated, any reference to Rules shall be deemed to refer to the Tax
Court Rules of Practice and Procedure.

Petitioners Angelo Zappo and Dorothy Zappo resided in Williamsville, N.Y., when they filed their petition herein. They computed their taxable income under the cash receipts and disbursements method of accounting.

Nottingham Village Corp. (Nottingham) was incorporated under New York law in April 1972 by Zappo, Cornelius Murphy (Murphy), and another person, who withdrew from the venture shortly thereafter. Zappo and Murphy each received five shares of Nottingham common stock upon its incorporation.

Zappo and Murphy organized Nottingham to acquire land and to build condominium townhouses in Orchard Park, N.Y. Nottingham borrowed funds from Citibank to purchase land and to begin development of a site for the townhouses. The land was used as collateral. The construction was to be done by Doran Builders (Doran), a separate corporation owned and operated by Zappo.

On August 2, 1973, a group of five investors (New Investors) executed an agreement (investment agreement) with Nottingham, Zappo, and Murphy under which each New Investor agreed to purchase two shares of previously unissued Nottingham common stock for $2,500 per share. The total investment of the New Investors was thus $25,000. Zappo and Murphy signed the agreement individually and in their capacity as officers of Nottingham. Pursuant to the investment agreement, Zappo and Murphy each received an additional share of Nottingham common stock.

On the same date, August 2, 1973, Zappo and Murphy entered into a loan agreement with the New Investors. Under this agreement (first loan agreement) each New Investor loaned $6,400 to Zappo and Murphy, jointly and severally, for a total loan of $32,000. Zappo received one half, or $16,000, of the loan proceeds. Murphy received the other half. To evidence this indebtedness, Zappo and Murphy each signed promissory notes to the New Investors bearing interest at the rate of 7½ percent per annum. The notes were payable on or before August 1, 1975.

Also on August 2, 1973, Nottingham, Doran, and the New Investors, as well as Zappo and Murphy, entered into another loan agreement (second loan agreement) pursuant to which the New Investors loaned Doran $100,000. Zappo, Murphy,

and Nottingham executed separate agreements under which they guaranteed the repayment of the loan from the New Investors to Doran. Zappo and Murphy also pledged all of their shares in Nottingham to the New Investors as collateral for both the first and second loan agreements.

The association between Zappo, Murphy, and the New Investors was not congenial. Within a year after the first and second loan agreements were entered into, the New Investors claimed that Zappo and Murphy had made misrepresentations, breached warranties, and were in default with respect to those agreements. They then asserted their rights to sell the pledged Nottingham shares. Zappo and Murphy denied these claims and, pending settlement of the dispute, refused to pay principal and accrued interest upon the indebtedness represented by the first and second loan agreements. They also denied that the New Investors had a right to sell the pledged Nottingham stock. During the dispute, Nottingham failed to make payments due to Citibank and Citibank threatened foreclosure on Nottingham's land.

After the exchange of repeated accusations and counteraccusations, the New Investors, Zappo, Murphy, and Nottingham reached an agreement to resolve their differences. On October 10, 1974, they executed a settlement agreement to formalize the resolution. The settlement agreement recited that it was intended to dispose of all disputes concerning the investment agreement as well as the first and second loan agreements. Under the settlement agreement, Zappo and Murphy transferred all of their Nottingham stock to the New Investors and agreed to release Nottingham and the New Investors from all claims which Zappo and Murphy had against them.

The settlement agreement also provided that Zappo and Murphy would execute and deliver to Nottingham a separate agreement under which they would guarantee that Nottingham would be paid $53,500 by N.V.T.H., Inc., under an agreement between Nottingham and N.V.T.H. The separate guarantee agreement reads in pertinent part as follows:

### GUARANTEE AGREEMENT

AGREEMENT, this 10th day of October, 1974 by and among ANGELO J. ZAPPO (hereinafter "Zappo"), CORNELIUS J. MURPHY (hereinafter "Murphy"), JAMES DALY, JR., LAWRENCE MARTIN, URBAN PAULY, WILLIAM JOHNSON and FRANCIS McGARRY [New Investors].

WITNESSETH:

WHEREAS, Zappo and Murphy have received certain loans from [New Investors] and have individually guaranteed certain obligations to the [New Investors] arising out of the development and construction of the Nottingham Village townhouse development, and

WHEREAS, Zappo and Murphy desire to be released from said loans and personal guarantees or obligations by the [New Investors], and

WHEREAS, the [New Investors] are willing to release Zappo and Murphy from said loans, guarantees and obligations upon receipt of consideration for said release;

IT IS HEREBY AGREED AS FOLLOWS:

1. The [New Investors] hereby jointly and severally release Zappo and Murphy from any and all loans and guarantees and other obligations to the [New Investors], except as hereinafter provided.

2. In consideration for the said release, Zappo and Murphy hereby jointly and severally agree to pay to the [New Investors] the sum of $53,500.00, and which sum shall be payable to the individual investors [equally].

3. Said sum shall be due and payable on October 1, 1979 * * *

4. The full sum of $53,500.00 shall be payable as herein provided, except that the sum due and payable shall be reduced by that amount actually received by Nottingham Village Corporation pursuant to a certain agreement between Nottingham Village Corporation and N.V.T.H., Inc. dated October 10, 1974 and which agreement is attached hereto and made a part hereof.

5. In the event that no funds are received by Nottingham Village Corporation from N.V.T.H., Inc. as of October 1, 1979 pursuant to the terms of the agreement between Nottingham Village Corporation and N.V.T.H., Inc. dated October 10, 1974, Zappo and Murphy shall be required to make payment pursuant to Paragraph 2 herein * * *

N.V.T.H. was a completely separate corporation, being unrelated to any of the other parties; but as part of the overall settlement of their dispute Zappo, Murphy, and the New Investors had negotiated a sale of Nottingham's real properties to N.V.T.H. for a net minimum cash payment of $78,500. This amount represented 50 percent of the $157,000 which the New Investors had loaned to Zappo and Murphy ($32,000) and Doran ($100,000) and paid to Nottingham ($25,000) for their stock.

In an attempt to secure reimbursement for the New Investors of the other $78,500 which they had invested in the venture, Nottingham and N.V.T.H. entered into a contingent side agreement under which Nottingham would be paid out "of any profits arising out of the land and/or improvements as transferred by Nottingham to N.V.T.H.," $50,000 of the first

$100,000; $18,500 of the next $75,000; and $10,000 of the next $50,000.

The $53,500 used in the guarantee agreement was arrived at by reducing the $78,500 under the side agreement by the $25,000 which the New Investors had paid for the Nottingham stock which they still owned.

The sale from Nottingham to N.V.T.H. including the side agreement was closed on October 10, 1974, the same date the settlement agreement was executed by Zappo, Murphy, and the New Investors.

The parties have stipulated that, at the time of trial, N.V.T.H. had not paid Nottingham any amount under the contingent side agreement; Zappo and Murphy had not paid the New Investors any amount under the guarantee agreement; neither Nottingham nor the New Investors had instituted any legal action to collect or establish the amounts due from N.V.T.H. or Zappo and Murphy; and the statute of limitations for filing such actions had not expired. Thus, at the time of trial, the liability, if any, of Zappo and Murphy under the guarantee agreement had not been paid or otherwise extinguished.

The parties have also stipulated that Zappo had a basis of $450 in his six Nottingham shares.

### OPINION

Respondent contends that for tax purposes Zappo realized $16,000 on the transfer of his Nottingham shares to the New Investors under the settlement agreement. In his view, Zappo was released from the $16,000 liability under the first loan agreement[3] in exchange for his Nottingham shares. Accordingly, respondent concludes that Zappo realized a capital gain of $15,550[4] upon execution of the settlement agreement in 1974.

Petitioners insist that Zappo did not realize any gain under the agreement in 1974. They contend that Zappo assumed a

---

[3]Although Zappo's joint and several liability under the first loan agreement was recited to be $32,000, respondent apparently agrees that Zappo was indebted only to the extent of the $16,000 which he actually received from the New Investors.

[4]$16,000 of debt satisfaction less his basis of $450, or $15,550.

liability under the guarantee agreement to pay the New Investors $53,500. They argue that until this $53,500 liability is paid or until any applicable statute of limitations has expired, he has no gain or loss. In effect, petitioners argue that Zappo merely substituted one liability for another, and that the ultimate outcome of the transaction cannot be determined yet. However, they concede that they must eventually recognize $15,550 in income from the discharge of indebtedness if Zappo never pays any portion of the $53,500 liability under the guarantee agreement.

In rebuttal to petitioners' claims, respondent asserts that Zappo's liability under the guarantee agreement does not affect the tax consequences of the October 10, 1974, transaction. First, he contends that the settlement agreement and the guarantee agreement represent separate events with separate tax consequences. In the alternative, he claims that the contingent nature of Zappo's liability under the guarantee agreement precludes it from being treated as a continuation of Zappo's liability under the first loan agreement.

### Inseparable Transactions

Answering respondent's first argument, petitioners contend that the settlement agreement and the guarantee agreement cannot be separated for tax purposes. They argue that these agreements comprise parts of a single transaction in which Zappo transferred his Nottingham shares to the New Investors, released all of his claims against the New Investors, and undertook a $53,500 future obligation in exchange for release from his indebtedness under the first loan agreement and his guaranty under the second loan agreement. We agree that the settlement agreement and the guarantee agreement are parts of the same transaction.

Whether different events are indivisible parts of a single transaction depends upon objective factors which manifest the taxpayer's intent. See *First Seattle D. H. Nat. Bank v. Commissioner*, 77 F.2d 45, 48 (9th Cir. 1935), affg. 27 B.T.A. 1242 (1933). Relevant factors include the language of written contracts, if any exist; the interdependence of the challenged events; the closeness in time of the events; and the extent to which the events resolve a particular problem. See *First Seattle D. H. Nat. Bank v. Commissioner, supra*; *Zachry v.*

*Commissioner,* 49 T.C. 73, 82 (1967); *Howard v. Commissioner,* 24 T.C. 792, 802 (1955); *American Bantam Car Co. v. Commissioner,* 11 T.C. 397, 406 (1948), affd. per curiam 177 F.2d 513 (3d Cir. 1949), cert. denied 339 U.S. 920 (1950).

In this case, the settlement agreement refers to the New Investors' release of claims against Zappo and Murphy as being made in consideration for "all of the above transfer and conveyance [including that of the Nottingham stock], and of the covenants, undertakings, obligations and indemnities of and from the said Original Investors [Zappo and Murphy]." One of the undertakings and obligations of Zappo and Murphy to which the settlement agreement specifically referred was that of the guarantee agreement. Thus, the settlement agreement incorporates the guarantee agreement and by reference treats it as an integrated undertaking. From this, it is apparent that the contracting parties intended to treat the two documents as one agreement.

In addition, Zappo's transfer of his Nottingham shares to the New Investors, and his assumption of obligations under the guarantee agreement, were interdependent steps. If Zappo had not satisfied both conditions, the New Investors would not have been obligated under the settlement agreement to release him from their claims against him. The close relation of these events indicates that the agreements were inseparable.

We further observe that the settlement agreement and the guarantee agreement were both executed on October 10, 1974. That same date, N.V.T.H. purchased Nottingham's real property and executed the contingent side agreement. All three agreements were effective upon execution. On that date, Zappo transferred to the New Investors his Nottingham stock and assumed his obligations under the guarantee agreement. At the same time, the New Investors released Zappo from all claims that they had against him, including his $16,000 debt under the first loan agreement. The simultaneous effect of the three agreements clearly indicates that they were part of the same transaction.

Finally, the integration and inseparability of the settlement agreement and the guarantee agreement is shown by the fact that the New Investors, Zappo, and Murphy executed them to resolve a particular dispute. The New Investors believed

Zappo and Murphy were in default under the first and second loan agreements and issued notices of default. Zappo and Murphy hotly contested these allegations. In the meantime, Nottingham let its payments to Citibank become overdue, causing Citibank to threaten foreclosure. The contracting parties finally reached a mutually satisfactory agreement which, in pertinent part, involved Zappo's transfer of his stock and assumption of a new obligation in return for his release from any and all claims the New Investors might have against him. This agreement was formalized by the settlement and guarantee agreements.

The objective factors discussed above show that the settlement agreement and the guarantee agreement are insepar-ably linked. The settlement agreement sets forth the terms of the settlement transaction, while the guarantee agreement recites, with particularity, the nature of the liability assumed by Zappo and Murphy pursuant to the settlement agreement. Under these circumstances, we find that the settlement agreement and the guarantee agreement are indivisible parts of one transaction.

### Contingent Nature of Guarantee Agreement

Petitioners contend that since the guarantee agreement is an inseparable part of the settlement of October 10, 1974, it must be treated as a continuation of Zappo's obligation under the first loan agreement. They assert that the guarantee agreement merely "substituted" for, or refinanced, the first loan agreement, without any change in Zappo's underlying obligation to the New Investors. Petitioners maintain that Zappo was still liable to the New Investors for at least $16,000 after the settlement, and thus conclude that he was not discharged from $16,000 of indebtedness in exchange for his Nottingham shares.

The theory upon which petitioners rely is, in effect, an exception to the discharge-of-indebtedness rule of *United States v. Kirby Lumber Co.*, 284 U.S. 1 (1931). In general, when a taxpayer borrows money, he does not realize income because he has concurrently assumed an obligation to repay the borrowed funds. However, if the indebtedness is later discharged, forgiven, or canceled, the borrower must recognize income to the extent of the discharge. *United States v. Kirby*

*Lumber Co., supra.* The rationale for this rule is that when an indebtedness is forgiven, assets of the borrower, which were formerly encumbered by an indebtedness, become freely available for the borrower's use and enjoyment. Since the loan does not have to be repaid, the newly freed assets constitute income.

Petitioners argue that the rule of *Kirby Lumber* does not apply when a taxpayer issues or signs a new obligation to refinance his old obligation. This is because the assets formerly encumbered by the old discharged debt remain offset after the discharge by the taxpayer's assumption of the new obligation. In effect, since the taxpayer is still indebted to the same extent, the substitution does not sufficiently close the original lending transaction to justify realization of income.[5] Thus, in *Great Western Power Co. of California v. Commissioner*, 297 U.S. 543 (1936), the Supreme Court found that the exchange of one bond series for another bond series with similar, but not identical, terms was a substitution of indebtedness, not a retirement of the old series by repayment. Consequently, no gain was recognized to the issuer from the discharge of indebtedness at the time of the substitution. See also *Virginia Electric & Power Co. v. Early*, 52 F. Supp. 835, 837 (E.D. Va. 1943); *Little War Creek Coal v. United States*, 25 F. Supp. 764 (S.D. W. Va. 1938), revd. on another issue 104 F.2d 483 (4th Cir. 1939).

We agree that the refinancing of debt may preclude the application of the rule in *Kirby Lumber*. In fact, respondent has adopted this analysis in certain situations. For instance, in Rev. Rul. 58–546, 1958–2 C.B. 143, the Commissioner found that a corporate taxpayer, which issued new bonds to replace old bonds of equal face value, had gain only to the extent that its liability for accrued interest on the old bonds was canceled. Similarly, in Rev. Rul. 77–437, 1977–2 C.B. 28, the taxpayer realized gain when it issued new bonds to replace other outstanding bonds only to the extent that the face value of the old bonds exceeded that of the new bonds.

---

[5]For an extensive discussion of problems involved with the cancellation of indebtedness doctrine, see Eustice, "Cancellation of Indebtedness and the Federal Income Tax: A Problem of Creeping Confusion," 14 Tax L. Rev. 225, 241–242 (1959).

Respondent, however, claims that the guarantee agreement in this case was too contingent and too indefinite to be treated as a liability which refinanced, substituted for, or otherwise continued Zappo's debt under the first loan agreement. Accordingly, respondent contends that Zappo realized gain when the New Investors forgave the first loan agreement obligation in exchange for Zappo's Nottingham stock. We agree with respondent.

The guarantee agreement made Zappo liable to the New Investors both as a guarantor and as a primary debtor. Zappo was liable to the New Investors as a guarantor because he ensured that the New Investors, as beneficial owners of Nottingham, would be paid if N.V.T.H. failed to pay Nottingham under the contingent consideration agreement. Under this arrangement, Zappo's obligation to the New Investors was secondary and collateral to N.V.T.H.'s obligation to Nottingham, and constituted a promise to answer for the debt of another. Such an arrangement is a guaranty under the Federal income tax laws. *Howell v. Commissioner*, 69 F.2d 447, 450 (8th Cir. 1934), affg. 22 B.T.A. 140 (1931). Zappo was also liable to the New Investors as a primary obligor because he promised to pay them $53,500 even if N.V.T.H. never became liable to Nottingham under the contingent consideration agreement, and if certain other conditions failed to occur. In sum, under the guarantee agreement, Zappo both guaranteed N.V.T.H.'s obligation to pay Nottingham and agreed to become personally liable to the New Investors if N.V.T.H.'s obligation never materalized.

To the extent that the guarantee agreement was a guaranty, we find that it did not substitute for, nor did it refinance, Zappo's canceled obligation under the first loan agreement. Under the tax law, no immediate tax consequences result from the execution of a guaranty agreement. Instead, a guarantor has a taxable consequence only when his liability is certain and he pays it. See *Helvering v. Price*, 309 U.S. 409 (1940); *Eckert v. Burnet*, 283 U.S. 140 (1931); *Howell v. Commissioner*, *supra*. The rationale for the deferred recognition of the loss is that a guaranty is an inchoate obligation at the time of its making, and is not yet definite enough to constitute a payment. *Eckert v. Burnet, supra; Howell v. Commissioner, supra*. Such a collateral and secondary indebtedness, which

may never arise, is similarly not definite enough to refinance a retired obligation. Thus, to the extent that the guarantee agreement was a guaranty, it could not refinance Zappo's release from indebtedness under the first loan agreement or prevent his corresponding gain on the discharge.

In contrast to the tax treatment of guarantees, a primary and direct obligation used to refinance a discharged obligation can avoid the realization of income from the discharge of the old indebtedness. However, respondent contends that to the extent that the guarantee agreement of this case was a primary obligation, it did not amount to a refinancing of the first loan agreement. Instead, he insists that the guarantee agreement was too contingent a primary obligation to be treated as a true debt. As such, he concludes that it could not refinance a true debt, such as the first loan agreement, which had been canceled. We agree.

A note or obligation will not be treated as a true debt for tax purposes when it is highly unlikely, or impossible to estimate, whether and when the debt will be repaid. See *CRC Corp. v. Commissioner*, 693 F.2d 281 (3d Cir. 1982), and *Brountas v. Commissioner*, 692 F.2d 152 (1st Cir. 1982), revg. on other grounds 73 T.C. 491 (1980); *Gibson Products Co. v. United States*, 637 F.2d 1041, 1047 (5th Cir. 1981); *Saviano v. Commissioner*, 80 T.C. 955 (1983); *Graf v. Commissioner*, 80 T.C. 944 (1983).

Various factors affect whether an obligation will be treated as a genuine debt. In *Gibson Products*, the Fifth Circuit stated that "[in] a true lending transaction, there exists the reasonable likelihood that the lender will be repaid in light of all reasonably foreseeable risks." *Gibson Products Co. v. United States, supra* at 1047. In *Sunburst Oil & Refining Co. v. Commissioner*, 23 B.T.A. 829 (1931), the Board of Tax Appeals found that a loan was too contingent to be treated as a genuine debt because the taxpayer's liability thereunder was contingent on production from oil and gas wells which had not yet been drilled or proven productive. In *Redford v. Commissioner*, 28 T.C. 773, 778 (1957), this Court focused on the fact that the note in question could become null and void based upon certain unilateral actions by the lender. Later, in *Lemery v. Commissioner*, 52 T.C. 367 (1969), affd. on other grounds 451 F.2d 173 (9th Cir. 1971), we found that a primary obligation

was not a true debt because it would be repaid only from the profits of a business. See also *Columbus & Greenville Railway Co. v. Commissioner*, 42 T.C. 834 (1964), affd. per curiam 358 F.2d 294 (5th Cir. 1966); *Inter-City Television Film Co. v. Commissioner*, 43 T.C. 270 (1964); *Albany Car Wheel Co. v. Commissioner*, 40 T.C. 831 (1963); affd. 333 F.2d 653 (2d Cir. 1964). In each of these cases, the obligations were found not to be genuine debts.

We note that refinancing was not involved in *Brountas, Gibson Products, Sunburst, Lemery,* and *Redford,* where the issue was whether the amounts represented by certain notes could be included in the basis of assets. However, in each of these cases, the resolution of the basis issue turned on whether the obligations were too contingent to be recognized. The rationale underlying all the cases was that highly contingent obligations should not be treated in pari materia with their more conventional counterparts. We find that this reasoning applies with equal force to the issue of refinancing an indebtedness.

When an obligation is highly contingent and has no presently ascertainable value, it cannot refinance or substitute for the discharge of a true debt. The very uncertainty of the highly contingent replacement obligation prevents it from reencumbering assets freed by discharge of the true debt until some indeterminable date when the contingencies are removed. In a word, there is no real continuation of indebtedness when a highly contingent obligation is substituted for a true debt. Consequently, the rule in *Kirby Lumber* applies, and gain is realized to the extent the taxpayer is discharged from the initial indebtedness.

This approach, which merely affects the timing of tax consequences, was summarized concisely by the First Circuit as follows:

it is simpler, when faced with obligations to pay that are highly uncertain, to wait and see if the contingency occurs. If it does not occur, the obligations need never enter basis, for they do not represent any obligation to pay. If it does occur, the extent of the monetary obligation will be reasonably capable of calculation, and * * * can then be determined. [*Brountas v. Commissioner, supra* at 158.]

We find this approach applicable to the case before us.

A review of the guarantee agreement in light of the factors discussed above shows that it was not a true debt.[6] Zappo's duty to pay any amount under the agreement was subject to a number of conditions. First, Zappo's liability was not interest bearing and could not be ascertained until the end of 5 years. More important, Zappo was entitled to credit for any funds paid by N.V.T.H. to Nottingham under their separate contingent agreement. Furthermore, if Zappo's liability under the guarantee agreement arose because of N.V.T.H.'s failure to pay properly, Zappo was entitled to reimbursement from N.V.T.H. for the amounts which the latter should have paid, but did not. Similarly, because the guarantee agreement was a joint obligation, Zappo's liability would be reduced dollar for dollar by any amounts which Murphy contributed. Finally, if Doran made any payments to the New Investors under the second loan agreement, Zappo's liability would be reduced accordingly.

In comparison, Zappo's liability under the first loan agreement was fixed in amount ($16,000),[7] was due on a date certain (Aug. 1, 1975), and bore interest at a stated rate (7½ percent).

In view of the foregoing, we are convinced that Zappo's obligations under the guarantee agreement were too contingent on uncertain future events to be treated as an indebtedness which refinanced Zappo's liability under the first loan agreement. Respondent's determination on this issue will be sustained, but, to reflect concessions made by respondent,

*Decision will be entered under Rule 155.*

---

[6]The cases dealing with contingent liabilities cited above all involved nonrecourse loans, secured by assets of uncertain value. The apparent recourse nature of the guarantee agreement is not dispositive of whether it is a true loan. *Commissioner v. Tufts,* 461 U.S. ___ (1983). See also *Crane v. Commissioner,* 331 U.S. 1 (1947). If it is uncertain that a liability to pay will ever arise, the source of the assets from which the liability will be paid is not important. See *Saviano v. Commissioner,* 80 T.C. 955, 963 n. 9 (1983).

[7]See note 3 *supra.*