SAMUEL G. SHANNON AND ELIZABETH SHANNON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Shannon v. Commissioner
Docket No. 25444-91
United States Tax Court
T.C. Memo 1993-554; 1993 Tax Ct. Memo LEXIS 553; 66 T.C.M. (CCH) 1418; November 23, 1993, Filed *553 Decision will be entered for respondent. For petitioners: Roger E. Grove. For respondent: Thomas Rohall. RAUM
RAUM
MEMORANDUM OPINION RAUM, Judge: The Commissioner determined an income tax deficiency of $ 13,646 for petitioners' 1987 taxable year. At issue is whether income from discharge of indebtedness under section 61(a)(12) [1] was realized in 1986 or 1987. Petitioners also have attempted to raise an additional issue, in the event that we find that the income was realized in 1987, namely, whether the income was attributable to a passive activity for purposes of section 469. The case was submitted on the basis of a stipulated record. Petitioners, husband and wife, resided in Yuba City, California, at the time of filing their petition. As of March 7, 1987, they were indebted to Bank of America National Trust *554 & Savings Association (the bank) in the aggregate principal amount of $ 794,383.98 plus $ 286,610.89 interest. The debt arose as follows: Petitioners were the sole shareholders in Shannon Farms, Inc. (SFI), a corporation engaged in the business of farming. The bank made loans to SFI secured by various assets of SFI. Petitioners not only guaranteed the loans, but also pledged certain stocks held by petitioner Elizabeth Shannon (Mrs. Shannon) as further security for the loans. When SFI liquidated in approximately January 1984, it distributed all of its assets to petitioners, and they in turn assumed all of SFI's liabilities. Included in the obligations assumed by petitioners upon dissolution and liquidation of SFI was the debt owed to the bank. Upon liquidation of SFI, petitioners leased the assets received in the liquidation to Shannon Farms Partnership (SFP), a general partnership in which the only partners were petitioner Samuel G. Shannon (Mr. Shannon) and his son, Grover Michael Shannon. Petitioners' brief refers to them as equal partners. SFP was similarly engaged in the business of farming, and it began operations "on or about" the time that SFI was dissolved. Article *555 IX of the partnership agreement states that "Each partner shall participate in the control, management and direction of the business of the partnership." Sometime thereafter petitioners and the bank discussed the possibility of relieving them of a portion of their debt to the bank. A letter from the bank's attorney, James Armstrong (Armstrong), to Jack D. Brown (Brown), attorney for petitioners, dated December 18, 1986, read in pertinent part as follows: Subject to Samuel and Elizabeth Shannon being able to obtain the necessary funds, our respective clients have agreed to a full and complete settlement of all outstanding issues between them on the grounds set forth below: * * * 2. Samuel and Elizabeth Shannon shall pay Bank of America the sum of $ 607,000 in cash, and Bank of America will accept same in full satisfaction of the Shannons' indebtedness to the Bank. Upon receipt of said $ 607,000, Bank of America will release all of its security interests and deeds of trust, * * * 3. The above terms and conditions will be expanded into a complete settlement agreement drawn by this office. 4. This settlement shall be consummated on or before March 1, 1987. You informed me *556 that the Shannons' source of the $ 607,000 payment would be a combination of the proceeds of the stock the Bank is currently holding as collateral, crop proceeds that are not anticipated until February, and a new loan from another lender. You had previously informed me that your clients would prefer to have their stock sold before year end, and I have informed you that the Bank will assist them in that endeavor. * * * Bank of America will hold the net proceeds of the sale of the stock, after deductions for normal commissions and other selling expenses, in an interest bearing account pending consummation of our settlement. In the event our settlement is not consummated, Bank of America will hold those funds until we reach an agreement or an impasse and/or litigation is commenced.
Brown thereafter mailed a letter to Armstrong dated December 22, 1986, which stated in pertinent part as follows: Your letter [of December 18, 1986] sets forth the essential terms and conditions upon which we have agreed to settle this case. This letter will confirm my telephone conversation to you of Friday, December 19, 1986, wherein I advised that my clients have authorized me to accept the settlement *557 proposal upon the terms and conditions set forth in your letter. It is my understanding that the proposal has previously been authorized by the Bank's management and now, in that it has been authorized by my client, it is my understanding that in fact we have a settlement as set forth therein and we shall now proceed to the documentation and close.
On December 29, 1986, the bank through the brokerage firm of Charles Schwab & Co., Inc. (Schwab), "sold several shares of stock" owned by Mrs. Shannon. However, the bank did not receive any part of the proceeds until the following year, 1987. It received such proceeds at times shown below, and the proceeds (together with interest in accordance with the third paragraph of item 4 of the December 18, 1986, letter of the bank's attorney, quoted above) amounted to $ 334,950.84, which was applied to the $ 607,000 that petitioners were to pay the bank. The $ 334,950.84 consisted of the following components: Sales proceeds received on 1/9/87
$ 250,777.28
Sales proceeds received on 1/15/87
33,425.40
Sales proceeds received on 2/23/87
49,214.70
Interest on savings account opened on
1,533.46
1/9/87 and closed on 2/18/87
334,950.84
*558 In a letter dated February 10, 1987, petitioners' attorney wrote to petitioners, stating: While I have not received the final settlement documents from Bank of America, our mutual letters of December 18, 1986 and December 22, 1986 contain the essential terms of the agreement that has been entered into and in my opinion, constitute a binding agreement regardless of the fact that final documentation has not been completed. The agreement provides that the $ 607,000.00 due Bank of America shall be payable on or before March 1, 1987. * * * It was expressly understood that time was of the essence and it is imperative that the funds be available on or before that date. * * * Please provide me with an update with respect to your progress in obtaining the funds * * *
On or about February 28, 1987, the bank received a personal check from Mrs. Shannon in the amount of $ 262,549.16 to be applied to the $ 607,000 that petitioners were to pay the bank. Finally, sometime on or after March 3, 1987, the bank received an additional payment of $ 9,614 out of stock sale proceeds which it applied to petitioners' loan obligation. Thus, it was not until March 3, 1987, that petitioners' net *559 payments to the bank totaled $ 607,000. [2]
Petitioners and the bank subsequently signed the written settlement agreement entitled "Agreement and Release" in March 1987, which formalized the parties' understanding that petitioners would pay and the bank would accept $ 607,000 in full satisfaction of petitioners' debt to the bank. Pertinent provisions of that agreement were as follows:
1.10 WHEREAS, Samuel G. and Elizabeth V. Shannon and/or Shannon Farms, Inc., are indebted to Bank upon the following loans set forth below by loan number, total principal owed, and interest owing to March 7, 1987; Loan No. Principal Interest
90040-84
$  83,233.00
$  32,323.18
90040-97
621,850.98
212,076.65
90040-98
16,500.00
7,616.93
90040-99
72,800.00
31,506.62
90040-94
-0-
1,817.26
90040-95
-0-
368.05
90040-96
-0-
902.20
TOTAL
$  794,383.98
$ 286,610.89
FULL TOTAL:
$ 1,080,994.87
*560 * * * 1.14 WHEREAS, Bank and Samuel G. and Elizabeth V. Shannon previously agreed that Bank should liquidate Elizabeth V. Shannon's stock, and hold the proceeds thereof in an account bearing 5% interest until this Agreement was consummated; 1.15 WHEREAS, on or about February 17, 1987 Samuel G. Shannon requested Bank to apply the proceeds of the stock liquidation to the Loans; 1.16 WHEREAS, Bank liquidated said stock, and the total amount of said liquidation applied to the Loans, including interest paid at 5% on said funds through February 17, 1987, is the sum of $ 334,950.84; 1.17 WHEREAS, Bank has been informed by Charles Schwab, Inc., that an additional $ 9,614.00 of stock liquidation proceeds should be received by Bank in the near future; 1.18 WHEREAS, on or about February 28, 1987 Bank received a personal check from Elizabeth V. Shannon in the amount of $ 262,549.16; * * * 2.0 BANK'S OBLIGATIONS
2.1 Bank will accept the sum of $ 607,000 in full satisfaction of the Loans; * * * 2.4 All Bank's obligations under this Agreement are contingent upon Bank's receipt of the actual funds represented by Elizabeth V. Shannon's personal check more specifically *561 described in paragraph 1.18 above, and receipt of the $ 9,614.00 described in paragraph 1.17 above; * * * 4.0 DEFAULT
4.1. If Bank does not receive the funds represented by Elizabeth V. Shannon's personal check described in paragraph 1.18 above in the ordinary course of its banking business or does not receive the funds set forth in paragraph 1.17 within a reasonable period of time, Bank's duty to perform any of its obligations under this Agreement shall terminate and, at the option of Bank, shall make all obligations of Samuel G. and Elizabeth V. Shannon under the Loans immediately due and payable, * * * 5.0 MISCELLANEOUS
* * * 5.4 Integration. This Agreement and any instrument or agreement attached hereto or referred to herein integrates all the terms and conditions mentioned herein or incidental hereto, and supersedes all oral negotiations and prior writings except as specifically incorporated herein, in respect to the subject matter hereof; The agreement was signed by petitioners on March 20, 1987, and by the bank's representatives on March 27, 1987. Petitioners filed their returns on the cash basis. On their 1987 joint tax return, as originally *562 filed, petitioners reported $ 187,384 as income from cancellation of indebtedness (COD income) realized in 1987. The amount thus reported represented the difference, allowing for rounding, between petitioners' original $ 794,393.98 principal obligation and the $ 607,000 received by the bank in full satisfaction. [3] Petitioners in addition deducted the following losses against income on their 1987 return: A loss from farm rentals totaling $ 48,363, which was reported on Schedule F (Farm Income and Expense) of Form 1040, and aggregate losses from various partnership interests totaling $ 17,715, which was reported on Schedule E, part II (entitled "Income or Loss From Partnerships and S Corporations") of Form 1040. *563 Petitioners thereafter filed amended tax returns for their 1986 and 1987 taxable years, and on the amended returns reported the COD income in 1986 rather than in 1987. The importance to petitioners of treating 1986 rather than 1987 as the year the COD income was realized becomes apparent upon examination of section 469, which was added to the Code by section 501 of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085, 2233-2241. This newly enacted provision undertook to prevent a number of abuses made possible under then existing law. To the extent relevant here, an oversimplified version of that new legislation, which is sufficiently accurate for present purposes, is set forth in the margin. [4]
*564 In the Commissioner's notice of deficiency it was determined, inter alia, that the COD income was properly reportable for 1987 and not 1986. The Commissioner accordingly determined that petitioners' 1987 income should be increased by $ 22,804 to reflect a phased-in disallowance of passive losses, pursuant to section 469(m). [5] The adjustment relating to petitioners' passive losses resulted from recharacterizing petitioners' "farm rental loss" of $ 48,363 and $ 16,792 of petitioners' partnerships losses as passive losses, and then multiplying the sum of those two figures ($ 65,155) by 35 percent, i.e., the applicable percentage disallowed under section 469(m) for the year 1987, resulting in a disallowance of the rounded amount of $ 22,804 passive losses. Although the deficiency notice did not explicitly so state, it is clear from calculations contained in the notice that the Commissioner, in making the adjustment, did not treat the COD income as income from a passive activity, which would otherwise have been available to offset the passive losses. *565 The parties have stipulated that "Petitioners do not contest * * * the passive activities loss adjustment of $ 22,804.00." There remains at issue therefore merely whether the COD income should be recognized in 1986, as now contended by petitioners, so that it may be available to absorb all of their 1986 losses (passive or otherwise), or whether it should be recognized in 1987, as originally reported by petitioners. However, petitioners have also presented on brief an alternative issue, not raised in the pleadings, as to whether the COD income, even if held to be realized in 1987, should be characterized as passive income that would be available to absorb their 1987 passive losses. 1. Year in Which Income From Discharge of Indebtedness Was Realized
The pivotal issue is whether petitioners' COD income was realized in 1987, as reported in their original tax return for that year, or in 1986, as reported in their amended 1986 return. We hold that it was realized in 1987, not in 1986. To be sure, petitioners and the bank could have agreed in December 1986 that petitioners' indebtedness to the bank was discharged then and there (in December 1986) merely upon the bank's receiving *566 the promise of petitioners to pay $ 607,000. In that situation the COD income would have been realized by petitioners in 1986. But such was not the case here. The record before us overwhelmingly establishes that the bank's agreement to discharge the debt was conditioned upon petitioners' actual payment of the $ 607,000, which was not expected to, and in fact did not, occur until 1987. We agree with petitioners that a binding agreement was entered into between the bank and petitioners in 1986, as reflected in the exchange of letters between their attorneys. But those letters, as well as the formal settlement agreement of March 1987, make clear that cancellation of the indebtedness was subject to conditions, particularly the ultimate condition of the payment of $ 607,000 to the bank. The December 18, 1986, letter of the bank's attorney to petitioners' attorney, states that the settlement was "Subject to Samuel and Elizabeth Shannon being able to obtain the necessary funds" and that "Upon receipt of said $ 607,000, Bank of America will release all of its security interests and deeds of trust". The letter noted that petitioners' attorney had stated that the "Shannons' source *567 of the $ 607,000 payment would be a combination of the proceeds of the stock the bank is currently holding as collateral, crop proceeds that are not anticipated until February, and a new loan from another lender." Further, the letter made clear that the net proceeds of the sale of the stock would be held by the bank "in an interest bearing account pending consumption of our settlement", and that "In the event our settlement is not consummated, Bank of America will hold those funds until we reach an agreement or an impasse and/or litigation is commenced." Petitioners' attorney responded by letter of December 22, 1986, in which he acknowledged that the letter of December 18, 1986, from the bank's attorney "sets forth the essential terms and conditions upon which we have agreed to settle this case." We could go on and on emphasizing other materials in the record, already set forth earlier in this opinion, but it would be beating a dead horse. We find it clear beyond reasonable debate that the bank's agreement to cancel petitioners' indebtedness was subject to the condition that it actually receive the $ 607,000, and that condition was not finally satisfied prior to March 3, 1987. Moreover, *568 the final definitive agreement between petitioners and the bank, which was contemplated in the December 1986 exchange of letters between the attorneys for the bank and petitioners, makes even clearer that actual payment of the $ 607,000 was required as a condition to cancellation of the debt. Petitioners argue in substance that this final agreement should be treated as a nullity, since the debt had already been canceled by full payment of the $ 607,000 earlier in March 1987. However, the provisions of that final agreement are nevertheless probative as to the parties' intentions at the time of contracting, regardless of whether it was executed before or after completing the terms of the binding contract. Furthermore, petitioners have not explained why they signed that final agreement if it did not accurately reflect their intentions regarding a matter as critical as the conditions for discharge. In any event, we do not find it necessary to rely upon the provisions of the final agreement. Even prior to execution of that final agreement, the conditions embodied in the earlier preliminary binding agreement of December 1986 -- reflected in the exchange of the attorneys' letters -- *569 prevented the cancellation of debt from becoming effective prior to payment of the entire $ 607,000 to the bank. As we stated in Seay v. Commissioner, T.C. Memo. 1974-305, 33 T.C.M. 1406, 1408, "An agreement to cancel a debt in the future is not sufficient to discharge the indebtedness immediately if the cancellation is contingent upon future events"; accord Walker v. Commissioner, 88 F.2d 170 (5th Cir. 1937), affg. 34 B.T.A. 424 (1936). Petitioners' reliance upon Hanson & Van Winkle Co. v. Commissioner, a Memorandum Opinion of this Court dated March 10, 1944, is not helpful to them. That case involved facts quite different from those that are before us and that call for the result that we have reached. 2. Character of Income From Discharge of Indebtedness
Petitioners argue in the alternative that even if it should be determined that the $ 187,384 COD income was realized in 1987 rather than in 1986, it should nevertheless be characterized as income from a passive activity within the meaning of section 469, in which case it would more than offset petitioners' net *570 passive activity loss. This issue was not raised in the petition or in any motion to amend the petition. It was raised for the first time on brief. We could well refuse to decide the issue since it was not raised in the pleadings. Our Rule 34(b)(4) states that "Any issue not raised in the assignment of errors shall be deemed to be conceded." And as noted in Frentz v. Commissioner, 44 T.C. 485, 491 (1965), affd. 375 F.2d 662 (6th Cir. 1967), "The Court has held on numerous occasions that it will not consider issues which have not been pleaded." However, even if we were to exercise our discretion to pass upon the issue, we would find petitioners' position to be untenable. Petitioners' argument in substance is that in 1984 and at all times relevant thereafter they were merely lessors of the assets received in liquidation of their corporation (SFI), and that the bank's cancellation of the debt, which they originally guaranteed and with respect to which they then became the principal obligors, resulted in income that was related to their passive status as lessors. That argument is unrealistically based upon tunnel vision that *571 ignores the entire picture. The bank originally made loans to petitioners' corporation in connection with the conduct of a farming business. Petitioners, originally guarantors, became principal obligors upon liquidation of the corporation. True, the assets were technically leased to the Shannon partnership, but the same farming enterprise employing the same assets continued without interruption, and petitioner husband, as an equal 50-percent partner, was actively engaged in the business. Certainly, bearing in mind that the burden of proof was upon petitioners, there is nothing in the record to suggest otherwise. Indeed, as a partner, Mr. Shannon was required to be actively engaged in view of Article IX of the partnership agreement which provided that "Each partner shall participate in the control, management and direction of the business of the partnership." (Emphasis supplied.) In our judgment, petitioners' indebtedness to the bank cannot qualify under section 469(c)(1)(B) as related to a "'passive activity' * * * -- * * * in which the taxpayer does not materially participate." Petitioners' position that the indebtedness was related to a merely passive leasing activity *572 is unconvincing. Decision will be entered for respondent. Footnotes
1. Except as otherwise indicated, all section references are to the Internal Revenue Code in effect for the year at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. The components of the $ 607,000 payment were as follows: ↩
Proceeds from stock sales & interest, as of 2/23/87
$ 334,950.84 Personal check from Mrs. Shannon, on 2/28/87
262,549.16 Further proceeds from stock sales, as of 3/3/87
9,614.00 Less: cashier's check mailed to petitioners
(114.00)
(for proceeds in excess of $ 607,000)
Total
607,000.00 3. The $ 607,000 received by the bank was in full satisfaction not only of the $ 794,393.98 principal obligation but also of the $ 286,610.89 interest due thereon. However, since petitioners, cash basis taxpayers, apparently had not previously deducted such unpaid interest on their returns, the cancellation of the interest indebtedness obviously would not represent income to them. No controversy is before us in respect of the cancellation of the interest component of petitioners' debt to the bank.↩
4. The perceived abuse of using so-called tax shelters was responsible to a considerable extent for the addition of sec. 469 to the Internal Revenue Code. See S. Rept. 99-313, at 713-746 (1986), 1986-3 C.B. (Vol. 3), 1, 713-746. This new provision was designed to thwart a taxpayer's attempt to reduce taxable income by deducting "passive activity" losses incurred in the conduct of any trade or business in which the taxpayer does not materially participate (typically a limited partnership), and the term "passive activity" was broadly defined to include any rental activity. The legislative objective was achieved by denying the taxpayer the right to deduct passive activity losses from income unrelated to such activities, and permitting such losses to be used only to offset passive income. The provision was made generally effective for years beginning after 1986. However, pursuant to sec. 469(m), the limitations on the deduction of passive activity losses were made applicable on a phased-in basis, and became 100 percent effective after 1990. See infra note 5. As noted above, petitioners originally reported their COD income in their 1987 return, and to the extent that they had no 1987 passive income against which to offset their 1987 passive losses, such losses would not reduce their 1987 taxable income except as permitted by sec. 469(m)↩. They were apparently unaware of this situation when they filed their 1987 return, and therefore attempted by amended 1986 and 1987 returns to treat that COD income as realized in 1986 so that it might arguably absorb all their 1986 losses.
5. Sec. 469(m), originally designated sec. 469(1), phases in during years 1987 through 1990 the disallowance of losses from passive activities in which the taxpayer has a preenactment interest; i.e., an interest at the time that the Tax Reform Act of 1986 was enacted. Sec. 469(m) makes the passive loss restriction in sec. 469(a) inapplicable to a designated percentage of passive losses incurred during years 1987 through 1990 where such losses are attributable to preenactment interests. For the years 1987 through 1990, the designated percentages are as follows: ↩
Beginning of Taxable Year
Applicable Percentage 1987
65
1988
40
1989
20
1990
10